**COPLON v. UNITED STATES** (two cases).

Nos. 10339, 10801.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 30, 1950.

Decided June 1, 1951.

Leonard B. Boudin, of the Bar of the Supreme Court of New York, *pro hac vice,* New York City, by special leave of Court, with whom Max L. Rosenstein, Newark, N. J., was on the brief, for appellant.

Fred E. Strine, Special Asst. to the Atty. Gen. with whom Mr. George Morris Fay, United States Atty., Miss Rosalie M. Moynahan, Attorney, Department of Justice, Washington, D. C., and Mr. John M. Kelley, Jr., Special Asst. to the Atty. Gen., were on the brief, for appellee. Mr. Joseph M. Howard, Asst. United States Atty., Washington, D. C., also entered an appearance for appellee.

Before WILBUR K. MILLER, PRETTYMAN and PROCTOR, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

A grand jury in the District of Columbia returned a two-count indictment against Judith Coplon on March 16, 1949.

The first count charged that from about December 10, 1948, to March 4, 1949, the appellant copied, took, made and obtained documents, writings and notes which were parts of the official files and records of the Department of Justice containing intelligence reports relating to espionage and counter-espionage activities, for the purpose of obtaining information respecting the national defense and with intent and reason to believe that it would be used to the injury of the United States and to the advantage of a foreign nation, in violation of 18 U.S.C. § 793.

The second count charged that during the same period the appellant, being an employee of the Department of Justice and as such having custody of records, documents and papers filed with the Department, willfully and unlawfully concealed and removed therefrom certain extracts and summaries of reports of the Federal Bureau of Investigation containing intelligence data relating to espionage and counter-espionage activities, in violation of 18 U.S.C. § 2071.

After a trial which lasted about two and one-half months, the young woman was found guilty on both counts on June 30, 1949, by a jury in the United States District Court for the District of Columbia, and on July 1 was sentenced to imprisonment for ten years on the first count and three years on the second, to run concurrently. She appeals.

Judith Coplon became an employee of the Department of Justice in New York City on June 15, 1943. On January 16, 1945, she was transferred to Washington, D. C., as a political analyst in the Foreign Agents Registration Section of the Department. The function of that section is to administer the Foreign Agents Registration Act,* to obtain the registration thereunder of persons subject to its provisions, to review for accuracy and compliance with statutory requirements registration statements filed by such persons, and to review propaganda filed in accordance with the Act.

In October, 1948, the appellant was assigned to the Internal Security Section to

* 22 U.S.C.A. § 611 et seq.

examine F. B. I. reports relative to the activities of Russian agents or Communists so as to determine whether there was any indication of a violation of federal law. William E. Foley, who was head of the Foreign Agents Registration Section and of the Internal Security Section as well, testified that early in January, 1949, the appellant discussed with him reports concerning certain Russian agents in the United States. When he mentioned that he had received an additional report on that subject, appellant asked if and when she could see it and Foley replied that it was top secret. A week later appellant again asked him when she could see the top secret report and was told that he did not know. About a month later appellant visited Foley's office and for the third time asked to see the top secret report. Foley replied that it had passed into the custody of another official.

On or about February 1, 1949, Foley, having been informed that appellant was under suspicion, directed her no longer to examine internal security reports. A new employee was assigned to that task. Appellant objected to giving up this work and told Foley she was very disturbed over the change. Soon after a Mrs. Rosson had taken over such work, appellant visited her successor's office, said she wanted to look through the F. B. I. reports, and removed some of them. A few days later appellant again went to Mrs. Rosson's office and asked that she send her "any reports relating to foreign embassies, legations, or consulates, and especially the reports that were marked 'Internal Security—R.'" Mrs. Rosson sent appellant some fifty reports of that nature.

The appellant went to New York City on January 14, 1949, first informing Foley that she intended to do so. Because she was under suspicion, F. B. I. agents followed her and observed her movements. She reached New York about 5:00 p.m. and, after following a circuitous route to Broadway and 193rd Street, she was joined there shortly after 7:00 p.m. by a man afterwards identified by the F. B. I. agents as Valentin A. Gubitchev, a Russian national employed by the United Nations.

She and Gubitchev were together for some time, during which their movements were such as to indicate they were trying to elude observers.

Again on February 18, 1949, Judith Coplon went to New York and met Gubitchev. Once more they engaged in furtive behavior for a considerable period of time. During the surveillance by the F. B. I. agents that evening, while the two were on Broadway near 192nd Street, the appellant was seen to reach into her open purse and at that time Gubitchev, who had been behind, stepped up beside her and reached in front of her with his right arm. After a few steps together, he stopped and the appellant continued walking.

On the afternoon of March 3, 1949, appellant informed her superior, Foley, that she intended to leave for New York the next day on the 1:00 p.m. train. Late in the afternoon of March 3, Peyton Ford, The Assistant to the Attorney General, handed to Foley three office memoranda, one of which was marked "Strictly Confidential" and had as its subject "Amtorg Trading Corporation Internal Security— R." The memorandum referred to the efforts of Amtorg to obtain equipment relative to atomic research and expressed the Department's intention of determining whether Amtorg was sending out of the United States information and equipment relative to that highly secret subject. Foley did not know, but may have suspected, that this memorandum was to be used to ascertain what appellant would do with it. About 9:00 a.m. the next day, March 4, Foley handed the memorandum to appellant, telling her that it was "quite hot and very interesting."

The appellant left for New York on the 1:00 o'clock train according to plan and reached there about 5:00 p.m. The testimony of the agents who kept her under surveillance for four hours thereafter discloses the most remarkable conduct on the part of Judith Coplon and Valentin Gubitchev. They met, separated, met again; they travelled on foot, by subway and by bus, sometimes together and sometimes separately. At all times the two acted in a furtive manner, apparently taking the great-

est care to elude any persons who might be following them. They wandered from as far uptown as Broadway and 193rd Street to a point on Third Avenue between 15th and 16th Streets. There they were arrested by an F. B. I. agent at 9:35 p.m.

A number of items found in appellant's purse after her arrest were introduced in evidence, including twenty-two data slips which were memoranda of information contained in F. B. I. reports on file in the Department of Justice. Another document consisted of four pages typed on appellant's portable typewriter. It was dated March 3, 1949, and included the following paragraph:

"I have not been able (and don't think I will) to get the top secret FBI report which I described to Michael on Soviet & Communist Intelligence Activities in the US. When the moment was favorable, I asked Foley where the report was (He'd previously remarked that he'd had such a report); he said that some department official had it and he didn't expect to get it back. Foley remarked there was nothing 'new' in it. When I saw the report, for a minute, I breezed through it rapidly, remember very little. It was about 115 pages in length; summarized first Soviet 'intelligence' activities, including Martens, Lore, Poyntz, Altschuler, Silvermaster et al. It had heading on Soviet UN delegation but that was all I remember. The rest of the report I think was on Polish, Yugo, etc. activities and possibly some info on the CP, USA."

Among other papers taken from her purse and introduced in evidence was a two-page memorandum in appellant's handwriting concerning the contents of the "quite hot and very interesting" memorandum of March 3 from The Assistant to the Attorney General which was handed to Foley late in the afternoon of March 3 and given to Judith Coplon on the morning of March 4.

The appellant's principal reliance for reversal is that her arrest in New York on March 4, 1949, was illegal, that the subsequent seizure of documents from her purse was in violation of the Fourth Amendment and that, therefore, certain of those documents which were introduced in evidence against her were inadmissible.

We agree with the following comment concerning the arrest, and the circumstances in which it was made:[1]

"* * * The Bureau knew that she had twice been in contact with a Russian, who it was fair to suppose was an emissary of the Soviet Union of one kind or another. Their meetings had given every appearance of furtiveness and fear of apprehension. She had manifested a persistent interest in secret reports of the Bureau regarding Russia which was somewhat sinister in one of her position. On March 4th she was apparently prolonging her third meeting with Gubitchev quite unnecessarily, unless it were to find a moment for some critical action; and she was acting with redoubled caution and apprehension.

"This situation appears to us to have given ample reason to suppose that these meetings were in pursuance of a concerted venture whose object was the delivery of information prejudicial to the national security: in short, that a criminal conspiracy was in progress before the eyes of the agents."

In other words, Judith Coplon was participating in the commission of a felony in the presence of the F. B. I. agent when he took her into custody. That being true, any private person situated as the agent was would have been justified in arresting the appellant without a warrant. Both the common law[2] and the New York stat-

1. Coplon v. United States, 2 Cir., 1950, 185 F.2d 629, 635.

2. It is said in Bishop's New Criminal Procedure, vol. 1, § 165 (1913 ed.):
"§ 165. 1. Treason or Felony in Presence.—One who sees an act of treason or felony may arrest the offender. Moreover,—

"2. Attempted in Presence.—One who witnesses an attempt to commit a treason or felony is by law required to interfere to prevent it. Hence, though such attempt is only a misdemeanor, the person witnessing it may arrest the wrongdoer."

ute [3] authorized such an arrest. The question is, was the F. B. I. agent powerless to arrest without warrant for a felony which he observed being committed, although a private person in similar circumstances could have done so?

It is contended that a Bureau agent's sole power to arrest without warrant for a felony committed in his presence is conferred by a federal statute which authorizes him to do so only if he "has reasonable grounds to believe that the person arrested is guilty of such felony and there is a likelihood of his escaping before a warrant can be obtained for his arrest." The statute relied upon for this contention is 18 U.S.C. § 3052, as that section was worded on March 4, 1949, the date of appellant's arrest. It then read as follows: "The Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for felonies cognizable under the laws of the United States, where the person making the arrest has reasonable grounds to believe that the person arrested is guilty of such felony and there is a likelihood of his escaping before a warrant can be obtained for his arrest." June 25, 1948, c. 645, 62 Stat. 817.

■ The foregoing Code provision does not purport by its terms to deal with the power to arrest without warrant for a felony committed in an agent's presence. To the contrary, its language indicates it was not intended to deal with that power but only with the power to arrest without warrant for a felony already committed but not in the agent's presence. With respect to the latter power, it was reasonable and appropriate for Congress to forbid its exercise unless the agent "has reasonable grounds to believe that the person arrested is guilty of such felony and there is a likelihood of his escaping before a warrant can be obtained for his arrest." But the

words just quoted are obviously inappropriate concerning the power to arrest for a felony which an agent actually sees being committed.

■ In our view the Code provision under consideration was intended to do no more, and did no more, than confer upon agents the right to arrest without warrant, upon the prescribed conditions, for felonies already committed but not committed in their presence. The Code section did not confer upon Bureau agents any power to arrest without warrant for felonies committed in their presence and was not legislatively intended to deal with that subject. That being true, the following statement of the Supreme Court in United States v. Di Re, 1948, 332 U.S. 581, 589, 68 S.Ct. 222, 226, 92 L.Ed. 210, is applicable here: "We believe, however, that in absence of an applicable federal statute the law of the state where an arrest without warrant takes place determines its validity. By one of the earliest acts of Congress, the principle of which is still retained, the arrest by judicial process for a federal offense must be 'agreeably to the usual mode of process against offenders in such State.'"

There being no federal statute concerning this particular power of arrest, agents operating in New York had the power in that respect given by the state statute to private persons. The New York statute is declaratory of the common law, as shown in footnote 3, *supra*.

From the beginning of what is now the Federal Bureau of Investigation, in 1909, Congress knew that Bureau agents, not being peace officers in the usual sense of that term, were private persons with respect to their power to arrest without warrant, in the absence of legislation prescribing and defining their power. Congress also knew, of course, that a private person may arrest without warrant for a felony which he sees being committed,—a power which is uniform throughout the nation; and that a private person may also arrest

---

3. Section 183 of the New York Code of Criminal Procedure is in part as follows: "A private person may arrest another,

"1. For a crime, committed or attempted in his presence; * * *."

without warrant for a felony already committed but not committed in his presence, but only under prescribed conditions which vary widely in different states.

Congress knew, moreover, that as long as it refrained from legislating on the subject, the agents of the Bureau would continue to have the powers to arrest for felonies, without warrant, which we have just described. From 1909 until 1934, Congress was content to leave the agents with the arresting power of private persons. This meant, as we have just seen, that (a) throughout the United States the agents had the power to arrest without warrant for felonies committed in their presence, and that (b) they could arrest without warrant for past felonies not committed in their presence, but only under conditions and subject to limitations which differed greatly among the several states.

In this state of affairs Congress enacted in 1934 legislation [4] which was the forerunner of § 3052 as that section read on the day of Judith Coplon's arrest. It authorized Bureau agents " * * * to make arrests without warrant for felonies which have been committed and which are cognizable under the laws of the United States, in cases where the person making the arrest has reasonable grounds to believe that the person so arrested is guilty of such felony and where there is a likelihood of the person escaping before a warrant can be obtained for his arrest * * *."

Thus the original statute, from which § 3052 was derived, had to do only with arrests without warrant for felonies already committed and made such arresting power of Bureau agents uniform throughout the nation, whereas theretofore their power in that regard had varied in different states. The original 1934 statute did not touch the subject of arrests without warrant by agents for felonies committed in their presence, and so left them with the same power in that respect which was and is possessed everywhere by private persons.

On June 25, 1948, the 1934 statute was slightly changed and became the provision which we have quoted as § 3052. It will be observed that the words "which have been committed", which appeared in the 1934 Act after the word "felonies", were omitted in the revision of 1948. The reviser's note says of this and other slight alterations, "Minor changes were made in phraseology * * *."

It can hardly be said that the 1934 statute, which did not purport to treat of the power of an agent to arrest without warrant for a felony committed in his presence, was converted into a statute dealing with that subject and reducing an agent's authority in that regard drastically below that of a private person, simply because the words "which have been committed" were omitted when the statute was revised. We cannot suppose that Congress intended, by this slight alteration of the section, to make a Bureau agent powerless to act when a felony is committed before his eyes, although it is universally held or provided that a private person may arrest a felon observed in the commission of his crime. Yet that purpose must be attributed to Congress in revising the 1934 statute, if the arrest here is to be held unlawful.

Our conclusion is that the arrest of Judith Coplon on March 4, 1949, was lawful. The incidental search of her purse and seizure of the incriminating documents were therefore not unlawful and the documents were properly received in evidence.

The foregoing conclusion is in conflict with a holding of the United States Court of Appeals for the Second Circuit that the arrest of Judith Coplon in New York on the evening of March 4, 1949—the same arrest to which we have referred—was illegal, that the resultant search of her purse and seizure of documents therefrom was unlawful, and that the documents so seized should have been suppressed and not admitted in evidence against her. Coplon v. United States, 2 Cir., 1950, 185 F.2d 629.

It is pertinent at this point to explain how the question of the legality of the arrest with which we have dealt also was

4. June 18, 1934, ch. 595, 48 Stat. 1008, 5 U.S.C. § 300a (1940).

presented to and decided by the Court of Appeals for the Second Circuit.

Quite apart from the indictment under which she was convicted in the District of Columbia, Judith Coplon was also indicted on March 10, 1949, by a federal grand jury in New York City. She and Gubitchev were charged in one count with having conspired[5] to violate 18 U.S.C. §§ 793, 794 and 2071. Another count charged Judith Coplon alone with the substantive offense of attempting, on or about March 4, 1949, to transmit to Gubitchev, a subject and citizen of the Soviet Union, documents, writings, notes and information relating to the national defense with intent and reason to believe they would be used to the injury of the United States and to the advantage of a foreign nation, in violation of 18 U.S.C. § 794(a).

Convicted on both counts just described, Judith Coplon appealed to the United States Court of Appeals for the Second Circuit. That court reversed, holding the arrest to have been unlawful, as we pointed out above. From the résumé of the evidence which appears in the opinion of the Court of Appeals for the Second Circuit it appears that the proof in New York was substantially the same as the proof in the District of Columbia trial concerning the arrest of Judith Coplon and the facts and circumstances which led to and culminated in that arrest.

■ The Second Circuit Court of Appeals held[6] that the Act of 1934 to which we have referred and § 3052 derived therefrom " * * * was intended to be a constitutive, not a cumulative, grant of *any* powers of arrest without warrant which the agents were to have." (Our emphasis.) As indicated above, we are constrained to disagree with that holding because we think it clear from the language of the Act of 1934 that it was intended to grant to the agents the limited power therein defined to arrest without warrant for past felonies not committed in their presence, and that it was not intended to be a limitation of agents' power to arrest without warrant for felonies actually committed in their presence; and, we think, for reasons heretofore given, that the 1948 amendment (§ 3052) was adopted with the same congressional intent.

The Congress noted that on December 5, 1950, the United States Court of Appeals for the Second Circuit had construed the Act of 1934, both in its original form and as amended in 1948, as reducing Bureau agents' power to arrest without warrant for felonies committed in their presence below the power possessed by private persons; and less than a month thereafter took legislative action to insure that the law should not remain as the Second Circuit had declared it to be. It amended § 3052 to read as follows: "The Director, Associate Director, Assistant to the Director, Assistant Directors, inspectors, and agents of the Federal Bureau of Investigation of the Department of Justice may carry firearms, serve warrants and subpoenas issued under the authority of the United States and make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." (1 U.S.Cong.Serv. '50, p. 1255, 81st Cong., 2d Sess.)

This made unmistakable what we think was true before revision: that agents have the same power which private persons have to arrest without warrant for felonies committed in their presence. It is clear from the committee report which accompanied the amendatory act that Congress was conscious of, and did not intend to concur in, the court's holding that a Bureau agent could do less than a private person could do when he witnessed the commission of a felony.[7]

---

5. Under the general conspiracy statute, 18 U.S.C. § 371.

6. 185 F.2d at page 635.

7. The report of the Committee on the Judiciary of the House of Representatives, as it appears in 2 U.S.Cong.Serv. '50, p. 4323, 81st Cong., 2d Sess., included the following:

"Recently, the United States Court of Appeals of the Second Judicial Circuit

■ With respect to appellant's charges of error other than the alleged illegality of the arrest, we are of the opinion, despite her contention to the contrary, that the evidence was sufficient to sustain the verdict and that the trial court did not err in denying the motion to dismiss the indictment and in refusing to direct a verdict at the end of the government's case and at the end of the entire case. We have given careful consideration to all the appellant's assignments of error, including her criticisms of the charge to the jury and her charge of misconduct on the part of the prosecution, and find no prejudicial or substantial error. It follows that, considered only on the record presented in case No. 10339, the judgment of the District Court must be, and is, affirmed. That record was lodged with us before the appellant moved for a new trial and consequently does not contain that motion, the documents submitted in support of it, and the proceedings in the District Court with respect to it. A separate appeal was taken from the District Court's denial of the motion. Our affirmance of the judgment of conviction is without prejudice to the right and duty of the District Court to proceed in the manner directed in our opinion disposing of appeal No. 10801 which follows.

While the main appeal, No. 10339, was pending before us, we stayed proceedings therein to permit the District Court to entertain a motion for a new trial on the ground of newly discovered evidence, which appellant had indicated she desired to make. She filed her motion and voluminous affidavits in support of it. After

hearing, the District Court denied the motion for a new trial, and the appeal taken from that ruling is now before us as case No. 10801.

Some months subsequent to her trial in the United States District Court for the District of Columbia, the appellant was put on trial in the Southern District of New York under the indictment returned there to which we have referred. A prolonged pretrial hearing was conducted by the District Court in New York for the purpose of ascertaining the scope and extent of wiretapping activities alleged to have been engaged in by the government.

■ Section 605 of the Federal Communications Act, 47 U.S.C.A. § 605, makes inadmissible in federal courts evidence obtained by intercepting either interstate or intrastate telephone communications. Nardone v. United States, 1937, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; Weiss v. United States, 1939, 308 U.S. 321, 60 S.Ct. 269, 84 L.Ed. 298. "Leads" obtained by wiretapping may not be utilized by the prosecution, but the fact that wires were tapped does not vitiate a criminal prosecution if the government can establish to the court's satisfaction that its proof at the trial had an origin independent of wiretapping. Nardone v. United States, 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. The pretrial procedure in New York was what has come to be known as a "Nardone hearing."

The appellant alleged in her motion for a new trial here that she discovered for the first time at the New York hearing in December, 1949, and January, 1950, that her

reversed the conviction of one Judith Coplan [sic]. In the opinion reversing the conviction the court stated that the act of 1934, which is presently section 3052, title 18, United States Code, was not cumulative: i. e. as giving the agents of the Federal Bureau of Investigation added powers of arrest. In its opinion the court said that the act restricted the agents' powers of arrest, so that the effect was that the agents had less power of arrest than private persons. Moreover, the committee found that the United States marshals and their deputies have broader powers of arrest than the

Federal Bureau of Investigation agents. Therefore, in order to correct this situation, the proposed amendment is recommended to give Federal Bureau of Investigation agents the same powers of arrest as those presently possessed by United States marshals and their deputies.

"In recommending this legislation the Committee on the Judiciary proposes that the powers of arrest of an agent of the Federal Bureau of Investigation, under this bill, should be cumulative: i. e. adding to their powers as a private person."

telephone wires at her home and office in Washington and at her home in Brooklyn had been tapped by F. B. I. agents prior to, during, and subsequent to her trial in the District of Columbia. She urges that the government violated § 605 of the Communications Act by presenting evidence which it obtained by wiretapping, and that her motion for a new trial should have been granted because of newly discovered evidence, as she had not learned of the wiretapping activities until long after she had been convicted here.

We observe, however, that the evidence introduced against Judith Coplon was the testimony of eye witnesses who actually observed appellant's movements, of witnesses who had direct conversations with her, of witnesses who examined the documents seized from appellant at the time of her arrest, of witnesses who examined official records of the Department of Justice, and of witnesses who established the fact of her employment in that Department. None of this evidence could have been the result of intercepted telephone conversations. It may be that the agents learned through wiretapping of the appellant's intentions to make the journeys to New York City on January 14, February 18, and March 4, 1949, but this information was also given to Foley by the appellant herself. We conclude the District Court did not err in denying the motion for a new trial insofar as it was based on the theory that the government's proof was obtained by wiretapping or arose from "leads" obtained in that manner.

We are confronted, however, with another and a much more serious question with respect to the government's alleged wiretapping. In support of her motion for a new trial, the appellant charged that Bureau agents intercepted telephone conversations between her and her counsel, both before and during her trial in the District of Columbia.

■ If this occurred, it was a violation of the appellant's constitutional rights. The Fifth Amendment enjoins that no person be deprived of life, liberty or property without due process of law. Such due process includes the right of one accused of crime to have the effective and substantial aid of counsel. Neufield v. United States, 1941, 73 App.D.C. 174, 182, 118 F.2d 375, 383. Moreover, the Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

■ It is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him.

In Louie Yung v. Coleman, D.C.S.D. Idaho 1934, 5 F.Supp. 702, certain Chinese defendants in a state court, held in jail, were unable to speak English and their counsel could consult with them only through an interpreter. He asked permission to do that, but the sheriff and the prosecuting attorney refused to allow the consultation unless there was also present an interpreter selected by them. The defendants petitioned a federal district court for writs of habeas corpus. The court denied the writs but directed the defendant-sheriff to allow the petitioners to consult privately with their counsel through an interpreter selected by them. The court noted that the Sixth Amendment and the due process clause of the Fourteenth Amendment give the accused in criminal prosecutions the right to the assistance of counsel at all times.

The recent case of United States v. Venuto, 182 F.2d 519, was decided by the United States Court of Appeals for the Third Circuit on May 29, 1950. District Judge Lederle, sitting with the Third Circuit by designation, noted in his opinion the following facts, 182 F.2d at 521: "This trial lasted four days. The records upon which the prosecution was predicated were voluminous. Near noon of the second day, the Government closed its case, and defendant took the stand. His direct examination was completed late in the afternoon, and cross-examination commenced immediately. The court excused the jury at 4 o'clock, and thereupon stated: 'I would like to say to counsel, I do not want to keep this man in custody overnight—he is now committed for cross-examination so he will not discuss this case with anybody. Otherwise, I will have to commit him.' In the ensuing dis-

cussion, similar and more explicit directions were given by the trial judge to the effect that defendant and his counsel were required to bind themselves not to consult together during this eighteen hour overnight recess at this crucial point of the trial or the court would revoke defendant's bail and commit him to jail incommunicado so that no consultation would be possible. Yielding to the court's ultimatum, the vow of silence between accused and his counsel was given and fulfilled. Twice while defendant was on the stand, the court announced short recesses, and admonished the defendant to remain seated and 'have no discussion with your counsel or anybody else.' No such injunction was imposed upon any other witness during the trial."

With respect to the foregoing, Judge Lederle wrote the following, 182 F.2d at page 522: "To deprive an accused defendant and his counsel of the right to consult with each other during an eighteen hour court recess was most certainly deprivation of the defendant's constitutional right to consult counsel at all stages of the proceeding. We can find no justification for imposing a restriction of silence between accused and counsel during a trial recess. We reject the Government contention that defendant and his counsel must prove affirmatively the exact prejudice produced by this injunction in a federal prosecution. Not only would this require them to disclose what would have been privileged communication between attorney and client, but, as stated in Glasser v. United States, supra, 315 U.S. [60] at page 76, 62 S.Ct. [457] at page 467 [86 L.Ed. 680]: 'The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.' By restricting the right of consultation between this defendant and his counsel during court recesses, defendant was denied the right to have the assistance of counsel for his defense, as guaranteed by the Sixth Amendment to the Constitution. His objection on this ground and his motion for mistrial directed to the trial court were well founded. Accordingly, the conviction must be reversed and a new trial granted."

The sanctity of the constitutional right of an accused privately to consult with counsel is generally recognized and zealously enforced by state as well as federal courts. The court said in Ex parte Rider, 1920, 50 Cal.App. 797, 195 P. 965: "The right of an accused, confined in jail or other place of detention pending a trial of the charge against him, to have an opportunity to consult freely with his counsel without any third person, whose presence is objectionable to the accused, being present to hear what passes between the accused and his counsel, is one of the fundamental rights guaranteed by the American criminal law— a right that no Legislature or court can ignore or violate."

The same court held in Ex parte Snyder, 1923, 62 Cal.App. 697, 217 P. 777, that failure to allow a defendant confined in jail to have private consultation with his counsel violates his constitutional rights, and again in 1943 the California court, in Ex parte Qualls, 1943, 58 Cal.App.2d 330, 331, 136 P.2d 341, 342, said, "Their right to private consultations with their counsel is a corollary of the constitutional right to be represented by counsel in their defense."

In an Illinois case where the judge allowed the public defender only five minutes to talk with the defendant, did not permit conversation between them in a private room, and insisted on immediate trial, it was held that a fair trial had been denied. People v. Shiffman, 1932, 350 Ill. 243, 182 N.E. 760.

In New York it has been said that: " * * It is also equally true that the right to a private interview by a person accused of crime with his lawyer prior to trial is a valuable right, and it is the duty of the court to jealously guard the accused from deprivation thereof." Hughes v. Cashin, 1945, 184 Misc. 757, 54 N.Y.S.2d 437, 440–441.

Other state cases to the same effect are State v. Collett, Ohio App. 1944, 58 N.E.2d 417; McBride v. State, 1932, 121 Tex.Cr.R. 549, 51 S.W.2d 337; Snook v. State, 1929, 34 Ohio App. 60, 170 N.E. 444; Ford v. State, 1929, 121 Ohio St. 292, 168 N.E. 139; Thomas v. Mills, 1927, 117 Ohio St. 114, 157 N.E. 488, 54 A.L.R. 1220; Sanderson v.

State, 1926, 105 Tex.Cr. 198, 287 S.W. 251; Turner v. State, 1922, 91 Tex.Cr. 627, 241 S.W. 162, 23 A.L.R. 1378; State ex rel. Tucker v. Davis, 1913, 9 Okl.Cr. 94, 130 P. 962, 44 L.R.A.,N.S. 1083.

These cases unequivocally establish the principle that the two Amendments guarantee to persons accused of crime the right privately to consult with counsel both before and during trial. This is a fundamental right which cannot be abridged, interfered with, or impinged upon in any manner. The prosecution is not entitled to have a representative present to hear the conversations of accused and counsel. We consider it equally true that a defendant and his lawyer have a right to talk together by telephone without their conversations being monitored by the prosecution through a secret mechanical device which they do not know is being used. It would not be an answer to say that the accused cannot complain of the interception of his telephone conversations with his counsel if he had on other occasions ample personal consultation with his lawyer, face to face, which no person overheard. That fact would not erase the blot of unconstitutionality from the act of intercepting other consultations.

In his opinion denying the motion for a new trial,[8] the trial judge limited the generality of the constitutional guaranty that an accused shall have the right of private consultation with counsel by holding that the government's intrusion upon that privacy does not violate the two Amendments unless it is the means of procuring evidence used to convict. We quote from the opinion, 91 F.Supp. at page 870: "Again, while this [intercepting telephone conversations between accused and counsel] may have been a serious breach of ethics, such conduct cannot be punished by granting a new trial unless such conduct was the means of procuring evidence to convict the defendant. Quite perfectly the old adage, 'Damnum absque injuria' (Wrong without injury) would apply in the case."

The following also appears in the opinion:

"* * * It is contended in point Five that 'the interception of telephone conversations between attorney and client is in violation of the due process clause of the Fifth Amendment, etc.'

"Whatever ethical wrong there may have been in such conduct, if perpetrated, they were acts that could have no influence upon this case unless tainted and poisoned evidence was obtained thereby. Certainly there was no such evidence suggested, and counsel does not point out a line, or even a scintilla of testimony procured in this way."

■ We think the District Court erred in holding that the interception of telephone messages between appellant and her counsel before and during her trial, if it occurred, was nothing more than a serious breach of ethics unless such interception yielded evidence which was introduced against her. It is true, as the court pointed out, that § 605 of the Communications Act, as construed by the Supreme Court, does not make wiretapping an offense but does condemn as criminal the interception and disclosure of the contents of the message, both acts being essential to complete the offense. But that is not analogous to the Fifth and Sixth Amendments, which unqualifiedly guard the right to assistance of counsel, without making the vindication of the right depend upon whether its denial resulted in demonstrable prejudice. The Supreme Court said in Glasser v. United States, 1942, 315 U.S. 60, 76, 62 S.Ct. 457, 467, 86 L.Ed. 680: "* * * The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."

We think it is further true that the right to have the assistance of counsel is so fundamental and absolute that its denial invalidates the trial at which it occurred and requires a verdict of guilty therein to be set aside, regardless of whether prejudice was shown to have resulted from the denial. In the Glasser case, having held that the trial court "denied Glasser his right to

8. United States v. Coplon, D.C.D.C.1950, 91 F.Supp. 867.

have the effective assistance of counsel, guaranteed by the Sixth Amendment", the Supreme Court said: "This error requires that the verdict be set aside and a new trial ordered as to Glasser."

We conclude that the District Court erred in not affording a hearing as to the appellant's allegations that the government listened through a wiretapping device to her telephone conversations with her attorney before the trial and while it was going on. The order denying the motion for a new trial will be set aside, as far as that ground is concerned, and the case will be remanded for a hearing to determine whether the alleged interceptions actually occurred. If so, the District Court should award a new trial at which the accused can be free of surreptitious interception of her telephone conversations with her counsel, and can enjoy the right of his effective assistance whch is guaranteed by the Constitution.

■ A defendant in a criminal case may not legally be found guilty except in a trial in which his constitutional rights are scrupulously observed. No conviction can stand, no matter how overwhelming the evidence of guilt, if the accused is denied the effective assistance of counsel, or any other element of due process of law without which he cannot be deprived of life or liberty.

Case No. 10801 is reversed and remanded for a hearing in accordance with this opinion.

Case No. 10339 affirmed; case

No. 10801 reversed and remanded.

PROCTOR, Circuit Judge, concurring in part and dissenting in part.

I concur in the opinion in the main appeal, 10339; also in that part of the opinion in 10801 which upholds the conclusion of the District Court that the Government's proof was not traceable to tapping of the defendant's telephone wires. I dissent from the action of the majority in directing the District Court to determine whether government agents intercepted telephone conversations between the defendant and her attorney, and, if it so finds to grant a new trial.

Whatever may be thought of government officers surreptitiously intruding upon conversations between attorney and client, in my opinion that fact alone does not justify reversal of a conviction. Yet, the majority opinion is grounded upon the theory that interception of *any such conversation* between defendant and her counsel must, as a matter of law, be deemed to have deprived her of the effective aid of counsel, and entitle her to a new trial.

I can see no justification for another trial. A complete report of the trial resulting in the defendant's conviction does, I think, offer convincing proof that neither she nor counsel were, or could have been, in any way handicapped in the conduct of her defense. That record, and all the circumstances it reveals, satisfy me that the defendant did, at all times, enjoy the full and untrammeled aid of counsel. Indeed, it is difficult to imagine how information, of whatever nature, secretly possessed by government agents, could affect the service of her counsel. The motion for a new trial specifies nothing on this point. There is the bare assertion that defendant was deprived of her right to aid of counsel. Still, under the broad ruling of the majority, nothing more is required. Their directive calls for a new trial if *any interception* of conversations between defendant and the attorney did occur, however irrelevant or harmless to her defense. This broad stand is justified as the only means of vindicating the guarantee of the Sixth Amendment to right of counsel. With this doctrine I cannot agree. Assuming a wrongful intrusion upon privacy of consultation between client and attorney, if it did not impair the aid of counsel defendant was not prejudiced, and there is no occasion to vindicate the guarantee.

For reasons stated, I think the conviction should be affirmed now, without further proceedings. However, as under the majority ruling the case must go back to the District Court, I do with all deference submit that the ultimate and controlling issue there should be: Was the defendant de-

prived of the full aid of counsel? If so, she should have a new trial. If not, it must follow that she has had a fair trial and should not be granted another. Resort to the drastic action of allowing a retrial cannot serve to vindicate a right which has not been abridged. Precious though the right to aid of counsel may be as a safeguard to life and liberty, it is not a fetish to be worshiped blindly.