**UNITED STATES of America,**
**Plaintiff,**

v.

**Allen Fairfax COOPER, Defendant.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**Mark Joseph FLEURY et al.,**
**Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**Manuel ALVARADO and Terry**
**Gene Williams, Defendants.**

**Nos. CR75-L-7, CR74-L-14 and**
**CR74-L-18.**

United States District Court,
D. Nebraska.

June 19, 1975.

Duane L. Nelson, Sp. Asst. U. S. Atty., Lincoln, Neb., Keith Uhl, Asst. U. S. Atty., Des Moines, Iowa, for plaintiff.

Ann Mudge, New York City, for defendant Wesaw.

Elliot A. Taikeff, New York City, for defendants Fleury and Cooper.

Anthony C. Muller, Denver, Colo., for defendant Dodge.

Martha Copleman, % Wounded Knee Defense Committee, Council Bluffs, Iowa, for defendant Johns.

Robert Boult, % Wounded Knee Defense Committee, Council Bluffs, Iowa, for defendant Alvarado.

Martin C. Gideonse, Boston, Mass., for defendant Williams.

## MEMORANDUM ON VARIOUS POST-TRIAL MOTIONS

URBOM, Chief Judge.

Six convicted defendants have filed an assortment of posttrial motions and a seventh will be treated as if he had filed them. The defendants Dodge, Johns, Wesaw and Fleury have moved for a judgment of acquittal, for an order directing the government to comply with the defendants' pretrial request for information as to whether any of the defendants or defense counsel have been the subject of electronic surveillance or whether the government has made use of any informant or undercover operative at the offices or living quarters of the Wounded Knee Legal Defense/Offense Committee in Nebraska or South Dakota, and for an order dismissing the indictment on the ground of government misconduct (CR74–L–14, filing 65). The same defendants have moved for an order directing the government to file affidavits setting forth all relevant facts regarding informants or undercover agents (CR74–L–14, filings 77, 80 and 81). The latter motion has been denied by this court (filing 79) with the observation that the government had agreed to submit affidavits regarding the use of informants. Such affidavits were submitted at the evidentiary hearing of May 31, 1975. They are plaintiff's exhibits 1 through 8.

The defendants Alvarado and Williams have moved for judgment of acquittal (CR74–L–18, filing 44), arrest of judgment (CR74–L–18, filing 48), to dismiss for prosecutorial misconduct (CR74–L–18, filings 56 and 57), and two motions for further disclosure (CR74–

L-18, filings 58 and 63). One motion for further disclosure (CR74-L-18, filing 58) has been denied (filing 62) with the observation that the prosecutors had agreed to furnish affidavits. Such affidavits, plaintiff's exhibits 1 through 8, have been supplied.

Primarily, the issues raised by these motions—invasion of the attorney-client relationship by use of an informant, electronic surveillance, and prosecutorial misconduct—spring from the surfacing of Federal Bureau of Investigation informants, Douglass F. Durham, Harry Eugene (Gi) Schafer, and Jil Schafer, after the trials and before entry of judgments on the sentences.[1] It was only because of that surfacing that I concluded that an evidentiary hearing should be held.

The defendant Cooper (CR75-L-7), although no written motions have been filed on his behalf, will be considered as having made the same motions as the other defendants and was represented at the evidentiary hearing of May 31 by Elliot Taikeff. Cooper pleaded nolo contendere on May 13, 1974, but no judgment has been entered, partly because of the terms of his plea agreement and partly because of a common goal of positioning all these defendants' cases for simultaneous appeal on the jurisdictional issue bottomed upon the Treaty of 1868.

As reflected by my order of May 19, 1975 (CR74-L-18, filing 64), I have inspected *in camera* all Federal Bureau of Investigation informants files which were delivered with the assurance that they were all the informants files relating to Durham and the Schafers. These files were not made a part of the record here but are a part of the record before Judge McManus in *United States v. Crow Dog, et al.*, U.S.D.C.N.D.Iowa, CR 75-18, 19 and 20. My inspection caused me to conclude that only Durham, of the several persons requested by the defendants to be subpoenaed relative to the various motions now before the court, needed to be called. Durham's testimony was taken on May 31, 1975. The Schafers' involvement ended at such a time as to make any likelihood of invasion of an attorney-client relationship affecting the present defendants virtually impossible.

Nothing that has been presented by affidavit or testimony persuades me that there is basis for broadening the inquiry beyond the informant issue.[2] Were it not for the awareness that one inform-

---

1. The defendant Dodge has been sentenced and his case is on appeal. Accordingly, I could not grant him relief at this juncture.

2. As to the broad questions of government misconduct and electronic surveillance, I have taken into account (1) the testimony taken by Judge McManus on May 27, 29 and 30, 1975, in the case of *United States v. Crow Dog, et al.*, U.S.D.C.N.D.Iowa, CR75-18, 19 and 20, which is now marked defendants' exhibit B, 5-31-75 (3 volumes) and made a part of the record in these present cases; (2) portions of the transcript of the *Banks-Means* trial in St. Paul before Judge Nichol, which now is marked plaintiff's exhibit 9, 5-31-75, and is made a part of the record in these cases; (3) testimony taken before me on the hearing on these motions on May 31, 1975, and the exhibits received at that time, which are marked by a number or letter and distinguished from trial exhibits of the same numbers or letters by the date "5-31-75"; (4) a sheaf of copies of letters relating to a proposed plea bargain transmitted to me by Martha Copleman with her letter of May 15, 1975, which sheaf is now marked defendants' exhibit C, 5-31-75, and is made a part of the record in these cases; (5) a copy of an affidavit of R. D. Hurd dated April 3, 1974, in the *Banks-Means* case, which copy is now marked defendants' exhibit D, 5-31-75, and is made a part of the record in these cases; (6) copies of the affidavits of Kenneth E. Tilsen of March 20, 1975, and March 14, 1975, a copy of the affidavit of Katherine James of February 23, 1975, and a copy of the affidavit of Martha Copleman of March 15, 1975, all of which are attached to the supplemental motion to dismiss on grounds of prosecutorial misconduct, filing 57 in CR74-L-18; and (7) a memorandum by Roger Cubbage and Roger Adams regarding a plea bargain proposal, marked 12, which is the number given it by Judge McManus and received *in camera*. As to it, I have sealed it in an envelope marked "In Camera Document 12." It will be available on appeal but I shall not cause it to be produced to the defense.

ant, Durham, was a regular companion of Dennis Banks while Banks was being tried on Wounded Knee charges in St. Paul, Minnesota, from January through mid-September, 1974, and while the defendants now before the court were being tried in Lincoln, Nebraska, the motions now before the court would not merit evidentiary exploration after trial. Nothing new regarding governmental misconduct, except as use of Durham as an informant may constitute misconduct, or electronic surveillance has been significant enough to merit reopening those matters, they having been resolved before trial in the Consolidated Wounded Knee cases, CR73–5019, U.S.D.C.W.D. S.D. (see CR74–L–18, filing 17, and CR74–L–14, filing 8, adopting previous motions in CR73–5019, and my order in CR74–L–14, filing 19).

The first question is whether I now should require the government to supply additional affidavits and, if not, whether I should permit the defendants to subpoena and offer testimony of government personnel. Resolution of that turns upon the proper standard for granting potential relief of dismissal or new trial because of activities of a government informer.

A group of attorneys and nonattorneys, known as the Wounded Knee Legal Defense/Offense Committee, began at least as early as May, 1973, representing these defendants and many others charged as a result of the occupation of Wounded Knee, South Dakota, during the period of February to May, 1973. Their personnel has varied from time to time, but has included consistently at least Ramon Roubideaux, Kenneth Tilsen, Joseph Beeler and Mark Lane, and for substantial periods of time Anthony Muller and Roger Finzell, all attorneys. From May, 1973, through the present the Committee's offices have been located in more than one city and at one time or another have been in St. Paul, Minnesota, Rapid City, South Dakota, Sioux Falls, South Dakota, Lincoln, Nebraska, Council Bluffs, Iowa, and Cedar Rapids, Iowa. It functioned with specific trial counsel during the Wounded Knee-related trial in St. Paul, Minnesota, of Russell Means and Dennis Banks from January through mid-September, 1974, during Wounded Knee-related trials in Sioux Falls, South Dakota, during February through May, 1974, during Wounded Knee-related trials in Lincoln, Nebraska, from July, 1974, to January, 1975, and since then in Council Bluffs and Cedar Rapids, Iowa.

Trial of the defendants Fleury, Wesaw, Johns and Dodge took place in Lincoln without a jury from October 1 through October 17, 1974. Alvarado and Williams were tried before a jury in Lincoln from November 18 through November 26, 1974. Jurisdictional issues arising from the Treaty of 1868 were heard in Lincoln from December 16, 1974, through January 2, 1975. Directly serving as trial counsel were Elliot Taikeff, Forrest S. Mosten, Terry Gilbert and Anthony Muller in the October trial, and Norman S. Zalkind, Martin C. Gideonse and Donald Berman in the November trial. Of these only Muller, evidently, had extensive pretrial connection with the Committee. Muller was in Lincoln for seven and a half weeks during and immediately before the October trial in preparation for that trial, during which time documents relating to that and the November trial were at a barracks located near Lincoln. Defense strategy matters were prepared in part in St. Paul, Minnesota, by Tilsen, and communication between Muller and Tilsen was frequent. Sufficient interaction among counsel and nonlawyer workers occurred to permit a finding that the Wounded Knee Legal Defense/Offense Committee—or at least the legal arm of it—operated as a unit on legal matters affecting many Wounded Knee-related cases, including the ones involving the defendants now before the court, during the entire period between May, 1973, to the present time.

Douglass F. Durham was a paid F.B.I. informant during all times pertinent to

the present cases. He became, although not at the instigation of the government, an officer of the American Indian Movement and was present at meetings where defense strategy of Wounded Knee-related trials was discussed by members of the Committee in St. Paul. There is no indication that he ever had any contact with or heard any conversations involving trial counsel in the cases at bar. His sole visit to Lincoln during which he had access to information was in January, 1975, and the near certainty is that it was after January 2, when the treaty hearing ended. His role for the F.B.I. during the entire period relevant here was to report on AIM's movements, officers' status, illegal activities, caches of arms and foreign involvement. He was under explicit instruction not to report any defense strategy and did not do so. Whether he actually heard anything, even though he was physically present, that could have any relevancy to the cases at bar is doubtful. Nothing before the court is to the effect that he ever heard any trial strategy or learned any information regarding any facet of the cases of the defendants now before the court. Nothing before the court, including Durham's testimony and the Federal Bureau of Investigation file regarding Durham, indicates that he ever communicated to the Federal Bureau of Investigation or any other person associated with the prosecution any defense strategy or any information of possible usefulness in the defense or the prosecution of any of the defendants at bar. He undoubtedly heard trial strategy regarding the Banks-Means trial, but that is not shown to have had bearing on the defense of the persons now before the court.

Against this background the defendants' position is that they are entitled to a new trial, and perhaps a dismissal "where there is an intrusion [of the attorney-client relationship] which either yields confidential information or which provides an opportunity for the obtaining of such information (whether or not actually obtained and/or employed) . . . ." (Defendant Fleury's memorandum of law, p. 2.) Cited are *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Black v. United States,* 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *O'Brien v. United States,* 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967); *Coplon v. United States,* 89 U.S.App.D.C. 103, 191 F.2d 749 (1951); and *Caldwell v. United States,* 92 U.S.App.D.C. 355, 205 F.2d 879 (1953).

In *Glasser* the issue pertinent to the cases here was whether the trial court's appointment to represent a criminal defendant of a lawyer who already had been retained to represent a codefendant, where the codefendant had objected to the appointment and a possible conflict of interest appeared, was improper. The Supreme Court said:

"There is yet another consideration. Glasser wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected. Irrespective of any conflict of interest, the additional burden of representing another party may conceivably impair counsel's effectiveness.

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. . . ." *Glasser* v. *United States,* supra, at 75–76, 62 S.Ct. at 467

In *Black* the United States Supreme Court described the factual setting as follows:

". . . [T]he Solicitor General Advised the Court voluntarily, . . . after the petition for certiorari had

been denied, . . . but before an application for rehearing had been filed, that agents of the Federal Bureau of Investigation, in a matter unrelated to this case, . . . installed a listening device in petitioner's hotel suite . . . . The device monitored and taped conversations held in the hotel suite during the period the offense was being investigated and beginning some two months before and continuing until about one month after the evidence in this case was presented to the Grand Jury. During that period, 'the monitoring agents,' the Solicitor General advised, 'overheard . . . exchanges between petitioner and the attorney who was then representing him [Black]' in this case. . . . [T]he recordings . . . [were] erased from the tapes but . . . notes summarizing and sometimes quoting the conversations intercepted were available, and . . . reports and memoranda concerning the same [were] made. 'Neither the reports nor the memoranda,' he reported, 'were seen by attorneys of the Tax Division responsible for the prosecution of' this case until January 1964, when in preparing for trial they were included in material transmitted to them; the reports and memoranda . . . were examined by the Tax Division attorneys and retained by them until April 15, 1964, when petitioner's trial began; and the attorneys never realized until April 21, 1966, that any conversations between Black and his attorney had been overheard and included in the transcriptions." *Black v. United States, supra,* at 27–28, 87 S.Ct. at 191

After noting *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L. Ed. 654, and 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435 (1956), in which a new trial had been ordered because communication with a juror by an outsider during trial and an investigation of that

communication by the F.B.I. had subjected the juror "to extraneous influences to which no juror should be subjected" [3] and concerning which "neither [the juror] nor anyone else could say that he was not affected in his freedom of action as a juror," [4] the Supreme Court in *Black* said:

"There are other complicating factors here that were not present in *Remmer.* There the judge had been informed of the alleged jury tampering, but here neither the judge, the petitioner nor his counsel knew of the action of the federal agents. Moreover, the Solicitor General advises that the Tax Division attorneys did not know at the time of the trial that conversations between Black and his attorney were included in the transcriptions. In view of these facts it appears that justice requires that a new trial be held *so as to afford the petitioner an opportunity to protect himself from the use of evidence that might be otherwise inadmissible.*" (Emphasis added) *Black v. United States, supra,* at 28–29, 87 S.Ct. at 191–192.

Although *Glasser* demonstrates the significance of the attorney-client relationship, it does not declare the broad standard asked for by the defense here. Neither does *Black.* The reason for requiring a new trial in *Black,* according to the Supreme Court, was the fact that improperly intercepted evidence was actually in the possession of the Tax Division and its attorneys during trial and the defense needed an opportunity "to protect himself from the use of" such evidence. No such evidence was in the possession of the Federal Bureau of Investigation or the prosecutors in the present cases.

In *Hoffa,* the Supreme Court refused to order a new trial in a case in which evidence of jury tampering had been obtained by a government informant during the defendant's trial in an earlier

---

3. *Remmer v. United States,* 350 U.S. 377, at 382, 76 S.Ct. 425, at 428.

4. Ibid., at 381, 76 S.Ct. at 427.

criminal case, known as the Test Fleet case. During the informant's activities he did overhear conversations between one of the defendant's lawyers and prospective character witnesses in the Test Fleet trial, and the informant relayed that information to a federal agent who in turn reported it to the chief prosecutor in the Test Fleet trial. It is obvious that the Supreme Court was not required to decide the correct standard that would have been applicable to a verdict of guilty in the Test Fleet case. That it did not do so was made clear by the court in saying:

"We may *assume* that the *Coplon* and *Caldwell* cases were rightly decided, and further *assume, without deciding,* that the Government's activities during the Test Fleet trial were sufficiently similar to what went on in *Coplon* and *Caldwell* to invoke the rule of those decisions. Consequently, if the Test Fleet trial had resulted in a conviction instead of a hung jury, the conviction would *presumptively* have been set aside as constitutionally defective. Cf. *Black v. United States,* [385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26]"(Emphasis added).

"But a holding that it follows from this *presumption* that the petitioner's conviction in the present case should be set aside would be both unprecedented and irrational. . . ." (Emphasis added) *Hoffa v. United States,* 385 U.S. at 307, 87 S.Ct. at 416.

Thus the court in *Hoffa* began with assumptions and a presumption which it did not find necessary to test and which it neither avowed nor disavowed. One thing distinguishes the Test Fleet factual situation set out in the *Hoffa* opinion: the informant—at least as hypothesized by the court—"did observe and report to Sheridan [a federal agent] at least some of the activities of defense

counsel in the Test Fleet trial." No similar hypothesis has been supported factually in the cases at bar.

The *Coplon* case, decided by the United States Court of Appeals for the District of Columbia, held that, if Federal Bureau of Investigation agents intercepted telephone conversations between the defendant and her counsel before and during her trial, a new trial would be required whether or not prejudice was shown. In *Caldwell* the same court [5] ordered a new trial under these facts: the prosecution before the trial hired one Bradley to find out who was "behind" the defendant's alleged offenses; Bradley became intimately acquainted with the defendant and his counsel and served as defense assistant, gaining free access to the planning of the defense, including the defense attorney's conferences with witnesses, lawyers and the defendant; Bradley reported regularly to the prosecution regarding many matters connected with the impending trial, including at least one conversation between Bradley and the defendant's counsel regarding an eyewitness' identification of the defendant.[6]

These were the factual settings which were described by the Supreme Court in *Hoffa* as "government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel."[7] A feature of both *Coplon* and *Caldwell* different from the cases at bar is the intercepting of communications between the defendants and their counsel and in *Caldwell* the communicating to the prosecutors of the conversations. There is in the present cases no evidence that any conversations overheard were between defense counsel or workers and any of the defendants now before the court and no evidence that any reporting to the prosecutors was done.

---

5. Different panels decided the cases, Judge Miller being the only common member. Judge Proctor dissented in the *Coplon* case.

6. See footnote 4 of *Caldwell* opinion, 205 F.2d at 880.

7. *Hoffa v. United States,* 385 U.S. at 306, 87 S.Ct. 408.

That brings me to the case of *O'Brien*. The Supreme Court's majority opinion in its entirety states:

"The petition for a writ of certiorari is granted, judgment vacated and the case is remanded to the United States District Court for the Eastern District of Michigan for a new trial should the government seek to prosecute petitioners anew. *Black v. United States*, 385 U.S. 26 [87 S.Ct. 190, 17 L.Ed.2d 26]." *O'Brien* v. *United States*, supra, at 345, 87 S.Ct. at 1158. No facts are set out anywhere,[8] except in the dissenting opinion of Mr. Justice Harlan, in which Mr. Justice Stewart joined. From that opinion it appears that the Solicitor General in his response to the petition for certiorari notified the court that a microphone had been installed in a commercial establishment of the defendant and a conversation in which the defendant participated and regarding the impending trial was overheard but not communicated outside the Federal Bureau of Investigation and not to the prosecuting attorneys. Remanding for a new trial was termed "quixotically precipitate" by the dissent.

I am loathe to fail to follow any Supreme Court opinion. But when an opinion offers no rationale, and no standard except that of another case, it seems to me that the cited case should be the source of guidance to lower courts. The *Black* case has already been discussed *supra* and does not go beyond its own factual perimeters.

■■ It makes sense to me that no prejudice needs to be shown as a prerequisite to a new trial if overheard confidential communications between a defendant and his counsel or conversations of counsel about the defendant's case are within the knowledge of the prosecuting attorney at the time of the trial. The dangers of subtle use by the prosecutor of the information from the conversations, either evidentially or strategically, are obvious. On the other hand, when the prosecution knows nothing of the fact or contents of the conversations, danger to the defense or advantage to the prosecution is imperceptible, even by an agile imagination. A prophylactic rule to avoid temptation of a government investigative agency, such as the Federal Bureau of Investigation, to pass to the prosecution evidence gained from such conversations intercepted would serve no purpose in the present cases, where it appears that no such conversations were communicated to the Federal Bureau of Investigation by the informant. An informant realistically must be considered to be a step further from the prosecution than Federal Bureau of Investigation special agents who work regularly with prosecuting attorneys, and the prospect of an informant's relaying facts to prosecutors when the informant has been reporting to an investigative agency is too remote to require a rule of presumed prejudice when such an informant overhears but does not report to anyone confidential communications.

I am not alone in my interpretation of the foregoing cases. The United States Court of Appeals for the Eighth Circuit in *State of South Dakota v. Long*, 465 F.2d 65 (C.A. 8th Cir.1972), was confronted by a factual situation in which a prosecuting attorney during a preliminary hearing held the microphone of his tape recorder across the counsel table and recorded part of a conversation between the defendants and their counsel. The act was discovered and the tape erased before it could be used. On appeal from a granting of a writ of habeas corpus the court said:

"It is certainly true that where there is gross misconduct on the part of the Government, no prejudice need be shown. (Citing *Black*, *O'Brien*, *Caldwell* and *Coplon*.) However, those cases dealt with 'surreptitious invasion' of the grossest kind by a government agent upon the confidential attorney-client relationship. *United*

8. The circuit court's opinion did not touch the issue. 365 F.2d 601 (C.A. 6th Cir. 1966).

*States v. Brown,* 317 F.Supp. 531, 534–535 (E.D.La.1970).

"The deliberate eavesdropping by Hoggatt [the prosecutor] in this case, although clearly reprehensible, did not, in our opinion, rise to the level of surreptitious intrusion condemned in those cases. . . .

\*    \*    \*    \*    \*    \*

"Because of the peculiar facts of this case, we find that no prejudice was shown. While we in no way condone the actions of the State's attorney, we cannot say that there was a violation of defendants' sixth amendment right to effective assistance of counsel. . . ." *State of South Dakota v. Long,* supra, 465 F.2d at 72.

*United States v. Zarzour,* 432 F.2d 1 (C.A. 5th Cir. 1970), resulted in a remand to determine whether there were any disclosures by the informant to the Federal Bureau of Investigation and any disclosures by the Federal Bureau of Investigation to the prosecution of any information gathered from an intrusion of the attorney-client relationship. The court said that if by an *in camera* inspection of the Federal Bureau of Investigation file the trial court were to determine that "information concerning appellant's case was transmitted to the prosecution so as to violate his Sixth Amendment rights, disclosure of the relevant portions of the file must be made to him and a new trial ordered." The implication is that mere presence of an informant within the defense team with opportunity to gain confidential information relevant to the defendant's case is not sufficient to warrant a new trial. See, also, *United States v. Stassi,* 431 F.2d 353 (C.A. 5th Cir. 1970)

*Granello v. United States,* 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), like *O'Brien,* supra, is of mini-mal help, because of the absence of the majority's expression of rationale. The court denied certiorari, however, and declined to apply *O'Brien* and *Black,* where the Solicitor General asserted that the monitored attorney-client conversations related only to matters separate from charges involved in the immediate case. *Taglianetti v. United States,* 398 F.2d 558 (C.A. 1st Cir. 1968), interpreting *Granello, O'Brien,* and *Black,* held that an intrusion on attorney-client matters "demonstrably separate from the instant proceedings" does not automatically require a new trial.

■■ My analysis of the foregoing cases leads to this: If a government informant (1) gains information (2) relating to a charge then pending or being investigated (3) from overhearing conversations by counsel expected to be confidential, and (4) the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge, then there has been a violation of the defendant's Sixth Amendment right to counsel and a new trial is necessary if conviction has followed the divulging. Whether each of those elements is always essential, I need not decide. However, I am convinced that there must be the actual gaining, rather than mere opportunity for gaining, of information relative to a charge against the defendant, and the information must be obtained by the informant from an intrusion into the attorney-client relationship. Prejudice will not be presumed unless the intrusion can be called "gross." Transmittal of the information to the prosecutors is a significant, if not conclusive, factor in determining the grossness of the intrusion. Absent grossness, prejudice must be shown.[9]

9. In *United States v. Seale,* 461 F.2d 345 (C.A. 7th Cir. 1972), in which electronic surveillance possibly intruded upon attorney-client relations, the court held that sworn testimony, subject to cross-examination, of relevant government witnesses must be submitted on remand to show a lack of taint.

■ Applying this analysis to the cases at bar, I conclude that the evidence is insufficient to require a new trial or to warrant further judicial exploration of the subject. There is no evidence that the informant Durham in fact obtained any information relevent to any charge against any of the defendants now before this court. He overheard conversations between attorneys who simultaneously represented the interests of Dennis Banks and the defendants Dodge, Johns, Wesaw, Fleury, Alvarado, Williams, and Cooper; it would be only speculation to find a probability that those conversations touched any issue relevant to any of these persons other than Banks and his codefendant, Means. Much information was transmitted by Durham to the Federal Bureau of Investigation; none of it can be said to have had any bearing on any issue relating to the charges on which Dodge, Fleury, Wesaw, Johns, Alvarado, Williams, or Cooper were convicted.

Charges against Dodge, Johns, Wesaw, and Fleury involved incidents occurring in and near the home of Mrs. Joanne Larabee on April 27, 1973, outside the area around Wounded Knee encircled by federal agents. The details are set out in my memorandum of decision, filing 48 in CR74-L-14. There is no need for repetition here. Charges against Alvarado and Williams grew out of an occurrence on March 24, 1973, at the home of Frank Holy Rock, outside the perimeter of federal agents surrounding Wounded Knee. None of these defendants, none of the witnesses called by the prosecution or the defense, and none of the incidents from which the charges grew were ever mentioned by the informant Durham or the Federal Bureau of Investigation special agents in their testimony at the hearing on the motions now under consideration, or in the Federal Bureau of Investigation informants files examined by the court.

The defendant Cooper pleaded nolo contendere on May 13, 1974, and the issues remaining thereafter were those of jurisdiction of the court in view of the Treaty of 1868 and sentencing considerations. The evidence before the court does not suggest that the plea was influenced in any respect by the informant's knowledge, or that sentencing could have been affected by it.

Thus, neither a presumption of prejudice nor actual prejudice appears and no sufficient indication of possible prejudice has been shown to warrant further action by this court in requiring or permitting additional evidence. The defendants have asked for an order that the government directly declare whether there were informants other than Durham and the Schafers who were working at, associated with or employed by the Wounded Knee Defense/Offense Committee and whether any "dummy" defendants were indicted. In view of the standard which I have heretofore concluded to be the applicable one regarding intrusion of the defense camp and the affidavits of the prosecuting attorneys in these cases that no material in their files came from government informers of any kind and no information was obtained from the Federal Bureau of Investigation or from any other source concerning the defense strategy or tactics concerning these cases and at no time to counsel's knowledge was any information from sources inside the defense committee or its quarters or offices obtained or made available to the prosecution, I see no justifiable basis for requiring further showing by the government.

A separate order will be filed in each of the cases.