379 F.2d 521
 UNITED STATES of America, Plaintiff-Appellee,
v.
Robert WOLCOFF and Sanford Burton Wolcoff, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
John LORUSSO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Pat MANNO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Larry FREEDMAN, Defendant-Appellant.
 Nos. 15742-15745.
 United States Court of Appeals Seventh Circuit.
 June 2, 1967.
 Rehearing Denied July 19, 1967.
 
 Anna R. Lavin, Chicago, Ill., for appellants.
 Edward V. Hanrahan, U. S. Atty., Sheldon Davidson, Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, Gerald M. Werksman, Lawrence Jay Weiner, Asst. U. S. Attys., of counsel, for appellee.
 Before DUFFY, Senior Circuit Judge, and KILEY and FAIRCHILD, Circuit Judges.
 DUFFY, Senior Circuit Judge.
 
 
 1
 In an eleven-count indictment all defendants were charged in Count 1 with conspiracy to defeat the Bankruptcy laws and the Mail Fraud statute in violation of 18 U.S.C. § 371; in Count 2 with the transfer and concealment of bankruptcy property in violation of 18 U.S.C. § 152, and in Counts 3 through 11 with the use of the mails in furtherance of a scheme to defraud in violation of 18 U.S.C. § 1341.
 
 
 2
 After a trial before a jury, verdicts of guilty as charged were returned as to all defendants except defendant Hartman who, on motion of the Government, was severed on the first day of the trial.
 
 
 3
 Defendant Lorusso appealed, but has since abandoned his appeal. The remainder of the defendants have urged various grounds for reversal.
 
 
 4
 In October 1962, defendants Pat Manno [also known as Pat Manning] and Burton Wolcoff decided to go into the business of selling premiums.[1] The business was called Catalog Premium Specialties [Catalog]. Richard R. Levy agreed to be a third partner in the business and put up $2,000 as his share of the investment. He later withdrew.
 
 
 5
 In late October 1962, Larry Freedman and Burton Wolcoff offered a job to Morton Hartman. Wolcoff said Freedman and he had a business called Catalog Premium Specialities in Chicago. Two weeks later Hartman went to Catalog where Pat Manno was introduced by Burt Wolcoff as his partner in Catalog.
 
 
 6
 Hartman agreed to work as a buyer and salesman. Wolcoff told him his duties were to telephone manufacturers, wholesalers and factory representatives listed in the yellow pages of the telephone book, and to place orders for merchandise. Hartman was told to keep his orders down to about $25 to $50 because "Well, if we have to scam we have got to have small bills because the creditors won't come after us on a scam for small bills, but they would for big ones."
 
 
 7
 In early November 1962, Robert Wolcoff and John Lorusso came to Catalog where Lorusso was introduced to Hartman as Robert Wolcoff's partner in a company they were starting in Berwyn, Illinois, called Fiesta Warehouse Center (Fiesta). Bob Wolcoff asked for a list of suppliers who had supplied merchandise on credit to Catalog and to a business called "House of Carpets."
 
 
 8
 The word "scam" was used throughout the trial. One of the defendants explained that "scam" was the ordering of merchandise on credit and not paying for it, and thereafter going into phoney bankruptcy to beat the creditors out of the purchase price of the goods ordered.
 
 
 9
 Shortly after a move to Fiesta from Catalog, a meeting of all of the defendants was called. Each was assigned certain duties. Burton and Robert Wolcoff were to oversee all orders but would remain in the background. Burton explained that he and his brother Robert had just scammed a company called "House of Carpets" and because many salesmen would know them, they could not show themselves at Fiesta.
 
 
 10
 As credit manager, Burton Wolcoff used the name Burt Reynolds. At the first meeting of Fiesta, Burton explained to the others that they had to pay off certain creditors such as General Electric and other major appliance people, so that they could use them for credit references. However, he explained that with smaller companies the procedure would be to buy small quantities of merchandise, pay for them, then immediately reorder twice the amount previously purchased, and also to endeavor to get in a third order before the end of the month billing became due. Burton told them that cash received would be siphoned out of the bank account under fictitious names, supposedly for labor and other expenses. In one instance, a check of $5,000 was made payable to Hartman's father which Hartman endorsed. The proceeds went to Burton.
 
 
 11
 Without describing further details of the plan, it suffices to say that the evidence clearly showed that all of the defendants engaged in the conspiracy, were involved with the transfer and concealment of bankrupt property, and with the use of the mails to defraud. The only questions for our consideration are the various claims of error.
 
 
 12
 Perhaps the principal argument of the defendants is based on the order of the District Court granting the Government's motion to sever the case as to defendant Hartman on the ground that Hartman would be a government witness. The other defendants objected and entered motions for a mistrial and a postponement. Later, a renewed motion for a continuance was made by the other defendants. All these motions were denied. No hearing was requested; the motions were not renewed after Hartman took the stand. No additional motions were made.
 
 
 13
 The trial court ruled that an inquiry would be held "If it appears during the trial of this case, that you have been seriously prejudiced. * * *" No further inquiry was made. However, Hartman, on cross examination, testified he had decided some months earlier that he would testify for the Government. Apparently he told his attorney that he had had conferences with representatives of the Government. Defendants now argue that prejudice could not be shown by them without the holding of a hearing.
 
 
 14
 In support of the motions for a mistrial and for a continuance, counsel for defendants argued to the Court that the attorney for Hartman, shortly before the trial started, had participated in a conversation among all of defense counsel in which strategy was discussed, and that Hartman's counsel, at that time, knew that an application would be made to the Court to sever Hartman so that he could become a government witness.
 
 
 15
 Hartman's counsel stated to the court that neither trial strategy nor trial tactics had been discussed. Furthermore, it was conceded that Hartman was not present at the meeting, and that no contact was made between Hartman's counsel and the Government or Hartman. It further appeared that the only post-indictment conversation between Hartman and the other defendants or their attorneys was a telephone call between Hartman and Burton Wolcoff which did not concern the instant case.
 
 
 16
 No objection was made to the testimony of the witness Hartman. It seems clear the Government did not intrude upon any constitutionally protected area. Hoffa v. United States, 385 U.S. 293, 304-309, 87 S.Ct. 408, 17 L.Ed.2d 374.
 
 
 17
 We hold that the several defendants were not denied the effective assistance of counsel by reason of the order of the Court severing Morton Hartman as a party defendant, and the failure to hold a formal hearing. We do not think that Caldwell v. United States, 92 U.S.App. D.C. 355, 205 F.2d 879, and Coplon v. United States, 89 U.S.App.D.C. 103, 191 F.2d 749, cert. den. 72 S.Ct. 363, 96 L.Ed. 690, 342 U.S. 926, are pertinent to the facts which exist in this case.
 
 
 18
 Defendants insist that cross examination of the witness Hartman was prejudicially restricted. On cross examination, Hartman testified that he had not been promised anything to testify in this case; that no promises of any kind had been made to him, and that he had no animosity toward any of the defendants. He was asked if he wanted to share the blame with all the defendants, and he replied that it was not a matter of sharing the blame, that he was guilty. Some other questions were asked to which the Court properly sustained objections such as "You are deadly afraid, are you not, of the penalty that might be imposed upon you in consequence of this indictment?"
 
 
 19
 Hartman's statement that his life had been threatened did not come out on direct examination. It was brought out on cross examination that he had not testified truthfully to the FBI agents in November 1963 allegedly because his life had been threatened by defendant Pat Manning. Upon motion, this answer was stricken and the jury was instructed to disregard the answer.
 
 
 20
 We hold there was no prejudicial error due to any restriction in the cross examination of the witness Hartman.
 
 
 21
 Defendants argue the use of the word "scam" was improper insofar as it related to the activities of the Wolcoff brothers in the company called "House of Carpets." If nothing else, this testimony established a continuing course of conduct by defendants Lorusso and Robert Wolcoff. It was also proper to show that the Wolcoffs used assumed names to conceal their true identities from suppliers who knew them from previous scams. United States v. Wall, 7 Cir., 225 F.2d 905, 907, cert. den. 350 U.S. 935, 76 S.Ct. 307, 100 L.Ed. 816.
 
 
 22
 Error was claimed because Hartman was permitted to testify regarding the refusal of a co-defendant to answer questions of an FBI agent as to operation of Fiesta. We hold there was no error in this respect. We also hold that the trial court did not err in instructing the jury and in refusing to instruct as requested by the defense.
 
 
 23
 A number of additional claims of error are made by defendants. We have considered each of them. We do not think they merit individual discussion. We hold there was no prejudicial error in this respect.
 
 
 24
 The judgment of conviction as to each of the defendants is
 
 
 25
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Premiums are merchandise used by businesses as gifts to employees for making sales and as inducements to prospective customers