577 F.2d 200
 UNITED STATES of America
v.
Paul LEVY, Frank Moten, Donald Verna, Nicholas Visceglia.
Appeal of Donald VERNA.
 Nos. 77-1276, 77-2230.
 United States Court of Appeals,
Third Circuit.
 Submitted under Third Circuit Rule 12(6) Feb. 14, 1978.
Decided May 3, 1978.
As Amended June 21, 1978.
 
 Theodore Rosenberg, Brooklyn, and Maurice Brill, New York City, for appellant.
 Robert J. Del Tufo, U.S.Atty., Maryanne T. Desmond, Asst.U.S.Atty., Newark, N.J., for appellee.
 Before GIBBONS, HUNTER, Circuit Judges, and WEBER,* District Judge.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 These are consolidated appeals from a judgment of sentence (No. 77-1276) and from an order denying a motion under 28 U.S.C. § 2255 (No. 77-2230). The appeals present a complex and difficult problem of the joint legal representation of two criminal defendants, one of whom, unknown to the other defendant or to the lawyer representing them, was a government informer. The problem arose out of that netherworld of illegal drug trafficking, in which, as we have so often seen, the government's chief law enforcement method appears to be reliance upon informers. We think that under the circumstances here the district court did not adequately protect appellant Donald Verna's sixth amendment right to the unfettered representation of independent counsel. Accordingly, we reverse the judgment of conviction and order that the indictment be dismissed.
 
 
 2
 I. FACTS AND PROCEEDINGS IN THE DISTRICT COURT
 
 
 3
 On July 8, 1975, Special Agent Fitzgerald of the federal Drug Enforcement Administration (DEA) arrested Nicholas Visceglia. The arrest, which took place at the office of the Bronx County District Attorney in New York, was the result of a complaint sworn to by another Special Agent of the DEA. Visceglia was taken from Bronx, New York, to Newark, New Jersey, for arraignment before a federal magistrate. After Visceglia's arraignment, while he was being fingerprinted and photographed, Fitzgerald asked him whether he would be willing to cooperate with the federal law enforcement authorities. App. at 38.[1] At that time the DEA knew that Visceglia had been cooperating with the Bronx District Attorney since November, 1974. App. at 75. In fact, the federal arrest at the District Attorney's office had been pre-arranged by Special Agent Riley and by an Assistant District Attorney. Id. Fitzgerald regarded Visceglia as a prime candidate for cooperation with the federal authorities.
 
 
 4
 The charge on which Visceglia was arrested involved an alleged conspiracy to distribute heroin. Frank Moten, Paul Levy, and the appellant Donald Verna were also alleged members of that conspiracy. On July 17, 1975, a federal grand jury sitting in Newark, New Jersey, indicted all four for a conspiracy in violation of §§ 841 and 846. Verna is Visceglia's uncle. At the time of the indictment Verna was the operator of the Burnside Fraternal Association in Bronx, New York, where some of the drug trafficking took place.
 
 
 5
 On July 24, 1975, Visceglia, responding to Fitzgerald's overture, approached the DEA about the possibility of cooperating. By August 6, 1975, an arrangement was finalized whereby Visceglia would become an informer for the DEA as well as for the Bronx County District Attorney. Thereafter Visceglia's activities as an informer were supervised by one or more DEA agents.
 
 
 6
 On September 8, 1975, attorney Herbert S. Siegal entered an appearance in the federal case on behalf of both Verna and Visceglia. From the moment that Visceglia was retained as a DEA informer, the DEA knew that Siegal was representing both the nephew and the uncle. In addition, the DEA knew that both Siegal and Verna were unaware of Visceglia's informer status with the Bronx District Attorney's office or of his new status as a DEA informer. App. at 192. The prosecutor in charge of the federal case, Rhonda C. Fields, of the Organized Crime and Racketeering Section of the Criminal Division of the Department of Justice (Strike Force), knew that Visceglia had been cooperating with state authorities. However, she was not immediately informed that Visceglia had become a DEA informer as well.
 
 
 7
 From August, 1975, until February, 1976, Visceglia cooperated with the DEA in connection with other matters. In February, 1976, Fields informed the federal district court in Newark of Visceglia's status as a DEA informer. The court then instructed Fields to notify the attorney for the defendants of this fact. Consequently, on February 25, 1976, the government served by mail the following:
 
 NOTICE TO DEFENSE
 
 8
 PLEASE TAKE NOTICE that from approximately August 6, 1975, to the present, defendant Nicholas Visceglia gave information to the agents of the Drug Enforcement Administration and other federal and state agencies, concerning matters other than the captioned cases.
 
 
 9
 App. at 17. Siegal apparently received this notice shortly after it was mailed. On March 12, 1976, Siegal represented Visceglia in the Bronx County Supreme Court for sentencing on a state indictment to which Visceglia had previously pleaded guilty and for the entry of a guilty plea and subsequent sentencing on another state indictment. On April 19, 1976, Siegal wrote to Visceglia, stating that he planned to withdraw as Visceglia's attorney in the federal case in Newark. Siegal's letter to Visceglia states in part:
 
 
 10
 . . . It appears that on February 25, 1976, I received a notice from Rhonda C. Fields, Special Attorney, Criminal Division, Department of Justice, that from August 6, 1975 to the date of her letter, you gave information to agents of the Drug Enforcement Administration and other federal and state agencies concerning matters other than the aforesaid captioned case.
 
 
 11
 In view of the fact that I also represent another defendant, Donald Verna, Jr., I find that I must withdraw as your attorney because of a conflict of interest.
 
 
 12
 I hereby advise you to retain other counsel to represent you in the above case.
 
 
 13
 App. at 18. Copies of this letter were also sent to counsel for the co-defendants, to the government attorney, and to the district court itself. There is no indication, however, that a copy was sent to appellant Verna. The letter does not refer to Siegal's representation of Visceglia in the Bronx proceedings and does not identify the nature of the conflict of interest to which it refers.
 
 
 14
 On May 20, 1975, Siegal moved, on Verna's behalf, to dismiss the indictment or, alternatively, to obtain such other relief as the court deemed proper. Siegal argued that Visceglia's participation in discussions between Siegal and Verna constituted a governmental intrusion into the attorney-client relationship. An initial hearing was held on the motion in the district court on June 14, 1976. There is no indication in the record that Verna was present at that hearing. The government informed the district court that it had tentatively decided not to prosecute Visceglia, for whom the court had by then appointed separate counsel. The government also represented to the court that Fields had notified the court of the informer problem as soon as she learned of it. Although the government acknowledged that an opportunity to obtain attorney-client confidences had existed, it urged that no such information had actually been communicated in this case. The government asked the district court to hold an evidentiary hearing at which the absence of any communications could be established. That request raised the specter of further inroads into the attorney-client relationship in order to establish what confidential information Visceglia had obtained and whether that information had been communicated to the government. In order to obviate this difficulty, the court proposed to hold an in camera hearing, at which the government would be represented by an attorney who had no prior connection with the case and who would be prohibited from disclosing to the actual prosecutor anything which transpired in camera. An additional problem was whether Siegal's testimony would be necessary at such a hearing. The following colloquy discloses that the court was aware of this problem:
 
 
 15
 The Court: Do you think you would have to testify?
 
 
 16
 Mr. Siegal: I don't know. I will determine that after I examine Mr. Visceglia.
 
 
 17
 The Court: I would suggest that you ought not to testify and be counsel in the same proceeding.
 
 
 18
 Mr. Siegal: I understand that.
 
 
 19
 Transcript of June 14, 1976 hearing, at 13. However, the court did not inquire as to any duty of loyalty that Siegal may have owed to Visceglia. Moreover, the court did not ask Siegal whether he was representing Visceglia in the New York state court proceedings or elsewhere. The government was well aware that Siegal had continued to represent Visceglia in New York.
 
 
 20
 On August 4, 1976, the proposed in camera evidentiary hearing commenced. The record discloses that Verna was present at this hearing, still represented by Siegal. The court did not ask Verna whether, in light of a possible conflict of interest between him and Visceglia, he desired new legal representation. Nor did the court suggest to Verna that Siegal was a potential witness in the hearing which was about to commence. At the hearing the government produced the testimony of several DEA agents and of prosecutor Fields. Visceglia testified as a court witness. In addition, at the court's direction, the government produced the DEA case files on Verna and on co-defendant Levy. In its opinion denying the motion to dismiss the indictment, the district court summarized the testimony at the hearing as follows:
 
 
 21
 The testimony reveals some equivocation on the part of the Drug Enforcement Administration agents concerning the propriety of addressing inquiries to Visceglia about the present matter. The agents would have it that whatever Visceglia told them was volunteered by them. Visceglia's testimony was that the agents from time to time would make some oblique and general inquiries as to the intentions of Verna and Siegal. I am prepared to accept Visceglia's version that the agents did make some inquiry about the present matter; any other conclusion would be at war with natural expectations. It is most unlikely that Drug Enforcement Administration agents could associate with Visceglia on a recurring basis and not attempt to glean some information about this matter in which the Drug Enforcement Administration had a prosecutorial interest.
 
 
 22
 Nonetheless, as to Verna this record will not support the conclusion that the Drug Enforcement Administration received from Visceglia any such information gleaned from Visceglia's intrusion into the attorney-client relationship between Verna and Siegal. Visceglia at all time maintained that Verna was innocent of the charges asserted in the present indictment. It was Visceglia's position that the government witnesses, Charles Morris and Lee Logan, named in the indictment as indicted co-conspirators, were liars. This was asserted on the basis that Logan and Morris had testified for the government in a New York case which resulted in acquittal. Visceglia did quote Siegal as being of the opinion that Logan and Morris were lying and that he planned to "go all the way" with the case.
 
 
 23
 App. at 332-33. The court found references in the DEA case files to the same information about the unreliability of the government witnesses and about Siegal's opinion that, in view of this unreliability, the defendants planned to go to trial.
 
 
 24
 To summarize, the district court found that the DEA, which at all times was aware that its informer was represented by the attorney for a co-defendant, attempted to obtain information about the present matter and, at the very least, did learn that the defense strategy would be to concentrate on the credibility of two key government witnesses. The reference in the district court's opinion to Visceglia's quotation of Siegal regarding the credibility of Logan and Morris is a reference to discussions in which Verna, Siegal, and Visceglia all participated. Moreover, although the district court did not specifically so find, the record establishes unequivocally that not only the DEA agents but also prosecutor Fields became privy to this strategy.[2]
 
 
 25
 The district court refused to dismiss the indictment. In making this ruling, the court purported to apply a rule that, because an intrusion by the DEA had in fact occurred, the government must prove beyond a reasonable doubt that the intrusion did not result in prejudice to Verna. The government met that burden, according to the court, because the DEA had learned nothing more than that the defense planned to dispute the credibility of the prosecution's key witnesses.
 
 
 26
 Verna's motion to dismiss the indictment having been denied, the case proceeded to trial on December 15, 1976. The indictment against Visceglia and Moten had previously been dismissed. As a result of a plea bargain reached after two days of trial, Levy pleaded guilty to a superseding information. Thus, Verna was ultimately tried alone.
 
 
 27
 During the course of the trial two matters of dispute arose between Verna and Siegal. One was Siegal's advice that Verna should enter into the same plea bargain which Levy had made. The district court explained, on the record, its understanding of that dispute:
 
 
 28
 Shortly after the return of the indictment Mr. Visceglia became a government informant and was privy to conversations among Mr. Siegal, Mr. Verna and Mr. Visceglia.
 
 
 29
 This was made known in February of this year about six months after the indictment was returned.
 
 
 30
 We have had a hearing on it and I have written an opinion. Mr. Verna wanted to preserve his right to appeal from my judgment denying a dismissal of the indictment upon the ground that he had now been prejudiced by the invasion of his attorney-client relationship with Siegal because of the presence of Visceglia who was concurrently a government informant.
 
 
 31
 Mr. Pope has informed me that he took the proposed plea negotiation to the government, that is, to the United States Attorney, who turned it down and who, as I understand it from Mr. Pope's explanation to me later, the U.S. Attorney will not permit Mr. Verna to plead conditionally, that is, to stipulate to the truth of an Information and preserve his right to appeal from my prior decision.
 
 
 32
 The trial will either go on as against both Mr. Levy and Mr. Verna or according to the U.S. Attorney they will both plead guilty to this superseding Information.
 
 
 33
 App. at 656.
 
 
 34
 The other matter in dispute was Siegal's unwillingness to call Visceglia and a DEA agent as defense witnesses. At the pretrial hearing on Verna's motion to dismiss the indictment, there was ample evidence that Visceglia had told the DEA agents that Verna had not participated in the heroin distribution. Other evidence indicated that Visceglia had denied to the agents that Verna even knew the key government witnesses. At one point in the trial Verna moved to have Siegal replaced because of these disputes. After admonishing Verna against disagreeing with the tactical choices advised by his counsel, the court ruled:
 
 
 35
 I'm not going to declare a mistrial in this case. We're in this case three days now, and we'll continue it, we will try this case to a conclusion, to a jury verdict, and with Mr. Siegal.
 
 
 36
 Defendant Verna: I am proceeding against my will with my present attorney.The Court: All right.
 
 
 37
 Mr. Siegal: If your Honor please, under those circumstances I would like to withdraw.
 
 I have never in my life represented
 
 38
 The Court: No, Mr. Siegal.
 
 
 39
 App. at 652-54. At no point did the court inquire whether Siegal's prior representation of Visceglia, which we now know continued in Bronx, New York, at least through March 12, 1976, would in any way inhibit his cross-examination of Visceglia had the latter been called as a defense witness. Yet it is clear that Siegal had not, by sending Visceglia the April 19, 1976 letter quoted above, divested himself of his continuing obligation of confidentiality and loyalty to that former client. At no time in the proceedings in this case at the hearing on the motion to quash the indictment, at the trial, or at any other time did anyone explain to Verna that those obligations might place Siegal in a position of conflicting loyalties with respect to the tactical choices he was advising. Rather, at the end of the government's case and after the court had denied Verna's motion for a judgment of acquittal, this colloquy appears in the record:
 
 
 40
 Mr. Siegal: If your Honor please, after consulting with Mr. Verna, the prosecutor and consent of the defendant (sic), we have decided not to present a defense and not to put in any witnesses, and I would like to have Mr. Verna's consent on the record.
 
 
 41
 The Court: Mr. Verna.
 
 
 42
 Defendant Verna: I agree, your Honor.
 
 
 43
 The Court: You have discussed the question of putting on witnesses, particularly both yourself and Mr. Visceglia, with Mr. Siegal, and you agree that as a matter of discretion and wise tactics you should rest at this point, is that the idea?
 
 
 44
 Defendant Verna: I saw the error of my ways, your Honor.
 
 
 45
 Mr. Siegal: Defense rests.
 
 
 46
 Supp.App. at 6.
 
 
 47
 The jury returned a guilty verdict, and Verna was sentenced. Thereafter new counsel filed a § 2255 motion in which he raised the contention that Siegal's joint representation of Visceglia and Verna placed him in the position of conflicting loyalties and that Verna was thereby denied the effective assistance of counsel. The motion was brought before the same district judge who presided over the trial. The court denied the motion without conducting an evidentiary hearing. After quoting the colloquy in which Verna indicated that he no longer wanted Visceglia to be called as a witness, the court stated:
 
 
 48
 It would have been improper to explore the reasons for Verna's change of mind about calling Visceglia, since such an inquiry quite probably would have been an impermissible intrusion into the Verna-Siegal attorney-client relationship.
 
 
 49
 Supp.App. at 6.
 
 
 50
 In its consideration of the § 2255 motion, the district court proceeded on the assumption that Visceglia's testimony could have been favorable to Verna. Nevertheless, the court denied the motion and said:
 
 
 51
 The short of it is that Verna's papers do not make sufficient allegations to require an evidentiary hearing. If he proves everything he alleges, no basis for setting aside his conviction would result. With Visceglia available to testify as his witness, Verna expressly acknowledged his agreement that Visceglia should not be called. How that decision was derived is not stated. Nothing is said to support the bald conclusion that had present knowledge been available at the trial, the decision on calling Visceglia would have been the other way. There simply is no connection between Siegal's continued representation of Visceglia and the decision not to call him that can be gleaned from these papers. In no way is it asserted that Siegal's advice with which Verna eventually agreed not to call Visceglia was a result of Siegal's conflicting representation. With no allegation of such a causal relationship for a hearing to establish, there is no need for such a hearing.
 
 
 52
 Supp.App. at 8.
 
 II. THE APPEALS
 
 53
 On appeal here Verna urges, first, that on the facts found by the district court the indictment should have been dismissed since attorney-client confidences had actually been disclosed by Visceglia to the government. Secondly, he urges that, even if the court applied the correct legal standard for testing the consequences of such a disclosure, in this case both the hearing on the motion to quash and the trial were so infected by Siegal's conflict of interest that a new hearing and a new trial are required.
 
 A. The Motion to Dismiss the Indictment
 
 54
 The district court found that confidential information had in fact been sought by the DEA agents and transmitted to them by Visceglia. Nevertheless, the court held that Verna's constitutional rights were not prejudiced by such disclosure. In reaching this conclusion, the court noted our prior decision in United States v. Rispo, 460 F.2d 965 (3d Cir. 1972), but relied primarily on United States v. Cooper, 397 F.Supp. 277 (D.Neb.1975), and United States v. Crow Dog, 532 F.2d 1182, 1197-98 (8th Cir. 1976) (quoting and adopting the Cooper analysis).
 
 
 55
 In Rispo, a paid informer, who was represented by separate counsel, participated in a joint trial as a sham defendant. In the course of his preparation for the trial the informer's court-appointed attorney, who was unaware of the deception, conferred with the co-defendants' counsel regarding trial strategy. Without inquiring as to actual communication of confidences by the informer, we held that under the totality of circumstances due process required a new trial for all defendants. The grant of a new trial rather than the dismissal of the indictment indicates, however, that the presence of an informer in the defense camp does not alone require such a dismissal. Rispo did not present the circumstances of an informer retaining the same attorney as that of a co-defendant, and neither side here has informed us of any other case in which that fact pattern appeared. More important, Rispo did not involve actual disclosure of attorney-client confidences by the informer to the prosecution.
 
 
 56
 In the Cooper case a paid informer for the FBI became closely involved with the American Indian Movement and with the individual defendants, who had been indicted as a result of certain disturbances at Wounded Knee, South Dakota. Although the informer was present at meetings where defense strategy was discussed, he was under explicit instructions by the FBI not to report any defense strategy. Moreover, after holding an evidentiary hearing, the district court found that the informer had not disclosed any defense strategy. The district court in Cooper denied the defendants' post-trial motions for a new trial. After reviewing the then relevant authorities, the court stated:
 
 
 57
 My analysis of the foregoing cases leads to this: If a government informant (1) gains information (2) relating to a charge then pending or being investigated (3) from overhearing conversations by counsel expected to be confidential, and (4) the information is divulged before or during trial on that charge to the counsel handling the prosecution of that charge, then there has been a violation of the defendant's Sixth Amendment right to counsel and a new trial is necessary if conviction has followed the divulging. Whether each of those elements is always essential, I need not decide. However, I am convinced that there must be the actual gaining, rather than mere opportunity for gaining, of information relative to a charge against the defendant, and the information must be obtained by the informant from an intrusion into the attorney-client relationship. Prejudice will not be presumed unless the intrusion can be called "gross." Transmittal of the information to the prosecutors is a significant, if not conclusive, factor in determining the grossness of the intrusion. Absent grossness, prejudice must be shown.
 
 
 58
 397 F.Supp. at 285. The Cooper analysis was adopted by the Eighth Circuit in the related Crow Dog case. These authorities, the closest in point at the time of the district court's ruling on Verna's motion, announce the rule that mere intrusion by the informer into the defense camp will not require relief absent a showing of prejudice, but that prejudice will be presumed if the informer transmits information on defense strategy to the government.
 
 
 59
 In this case, however, the district court attenuated the Cooper rule by eliminating the presumption of prejudice from actual transmittal of confidential communications to the government. Instead, the court chose to weigh the prejudice to Verna even though there was both an admitted invasion of the attorney-client privilege and a transmittal of confidential information to the government. The court defined the legal standard as follows:
 
 
 60
 (T)he factual inquiry required must first focus on the question whether through Visceglia the Drug Enforcement Administration gained any information pertinent and prejudicial to this case.
 
 
 61
 App. at 330 (emphasis added). Inevitably that standard put the district court, and indeed would put future courts, in the position of speculating about the prejudice to the defense of the disclosure in question. The dangers of speculating about possible prejudice are demonstrated most forcefully by the facts of the instant case. As mentioned earlier, the district court concluded that Verna had not been prejudiced by the transmittal of information since the government had learned only that the defense intended to dispute the credibility of the government's key witnesses. But the court failed to mention the equally significant point that the enforcement authorities thereby necessarily became privy to the fact that this was the only likely defense strategy that the prosecution had to anticipate. The government witnesses were two black men who claimed to be present when drug transactions took place at the Burnside Fraternal Association. The defense strategy in the circumstances would be to discredit the black witnesses by attempting to establish that blacks were never admitted to that private club. The government's knowledge of this planned strategy would permit it not only to anticipate and counter such an attack on its witnesses' credibility, but also to select jurors who would be more receptive to the testimony of black witnesses against white ethnic defendants. While the significance of such benefits is, of course, speculative, such speculation is the inevitable consequence of the legal standard the district court adopted.
 
 
 62
 Where there is a knowing invasion of the attorney-client relationship and where confidential information is disclosed to the government, we think that there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudical to the defense the disclosure is. In this case a government attorney, sensitive to her obligation to prevent sixth amendment violations by agents of the United States, called the matter to the district court's attention. Consequently, the court was able to consider the problem in a pretrial hearing. But it is highly unlikely that a court can, in such a hearing, arrive at a certain conclusion as to how the government's knowledge of any part of the defense strategy might benefit the government in its further investigation of the case, in the subtle process of pretrial discussion with potential witnesses, in the selection of jurors, or in the dynamics of trial itself. Moreover, we know from the Rispo case that not all government attorneys can be counted on to act with the same punctilio as did Attorney Fields. In addition, the record here indicates the substantial risk that case agents of law enforcement agencies like the DEA, who actually work up the cases and assist government counsel at trial, might not even disclose to the government attorneys that certain information was obtained from the defense by an informer. In such cases the sixth amendment violations might be disclosed, if at all, late in the trial or after the trial had been completed. At that point a trial court applying an actual prejudice test would face the virtually impossible task of reexamining the entire proceeding to determine whether the disclosed information influenced the government's investigation or presentation of its case or harmed the defense in any other way.
 
 
 63
 Of course, the difficulties to which we refer could be obviated by a sufficiently severe definition of prejudice. For example, we could hold, by analogy to fourth amendment case law, that no prejudice occurs unless it is shown that some of the government's evidence would have been unknown to it, and thus unavailable, except for the disclosure of a confidence. Cf. Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Government of Virgin Islands v. Gereau, 502 F.2d 914, 927-28 (3d Cir. 1974). The analogy is not a good one, however, for the interests at stake in the attorney-client relationship are unlike the expectations of privacy that underlie the fourth amendment exclusionary rule. The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. Even guilty individuals are entitled to be advised of strategies for their defense. In order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government. No severe definition of prejudice, such as the fruit-of-the-poisonous-tree evidentiary test in the fourth amendment area, could accommodate the broader sixth amendment policies. We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society. In the instant case confidential information was disclosed to the government authorities.
 
 
 64
 The government urges that Weatherford v. Bursey, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), which was decided after Verna's trial but before the decision on his § 2255 motion, requires an affirmance. The government argues that the Supreme Court in Weatherford adopted the actual prejudice test which the district court applied below. We think not. Weatherford was an action under 42 U.S.C. § 1983 against an undercover agent, who was charged as a spurious defendant. The plaintiff in the § 1983 action was a convicted criminal defendant who alleged that the agent's participation in two pre-trial meetings between the defendant and his attorney violated the sixth and fourteenth amendments. The Fourth Circuit applied a per se rule that an informant's participation in attorney-client meetings violated the right to counsel and the due process clause of the fourteenth amendment, even though the district court had found that there had been no communication of information to the government and even though the informant had been invited to the meetings. The Supreme Court rejected the Fourth Circuit's per se rule and thus reversed the decision. But the Court carefully delineated the scope of its holding:
 
 
 65
 At the same time, we need not agree with petitioners that whenever a defendant converses with his counsel in the presence of a third party thought to be a confederate and ally, the defendant assumes the risk and cannot complain if the third party turns out to be an informer for the Government who has reported on the conversations to the prosecution and who testifies about them at the defendant's trial. Had Weatherford testified at Bursey's trial as to the conversation between Bursey and Wise; had any of the Government's evidence originated in these conversations; had those overheard conversations been used in any other way to the substantial detriment of Bursey; or even had the prosecution learned from Weatherford, an undercover agent, the details of the Bursey-Wise conversations about trial preparations, Bursey would have a much stronger case.There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.
 
 
 66
 429 U.S. at 554, 558, 97 S.Ct. at 843. (footnotes omitted). We think that the Court was suggesting by negative inference that a sixth amendment violation would be found where, as here, defense strategy was actually disclosed or where, as here, the government enforcement officials sought such confidential information. Whether or not that negative inference was intended, the Court certainly did not lay down a rule that when actual disclosure occurred, additional prejudice still must be found. Thus we are at least free to decide on policy grounds whether such a rule would be desirable. As we indicated above, we think that such a rule would be highly undesirable. Accordingly, we hold that the district court below erred in concluding that the availability of relief to Verna should turn on the court's partially informed evaluation of whether the informer's disclosure to the government agents prejudiced Verna.
 
 
 67
 Since in this case an actual disclosure of defense strategy occurred and since we reject the proposed rule that the damage done by such disclosure should be weighed on a case-by-case basis, we must consider what remedy is appropriate. In our judgment, the only appropriate remedy is the dismissal of the indictment. As a result of the district court's decision that no sixth amendment violation occurred, the same strike force group which originally handled the case was allowed to proceed with the trial. The disclosed information is now in the public domain. Any effort to cure the violation by some elaborate scheme, such as by bringing in new case agents and attorneys from distant places, would involve the court in the same sort of speculative enterprise which we have already rejected. Even if new case agents and attorneys were substituted, we would still have to speculate about the effects of the old case agents' discussions with key government witnesses. More important, public confidence in the integrity of the attorney-client relationship would be ill-served by devices to isolate new government agents from information which is now in the public domain. At least in this case, where the trial has already taken place, we conclude that dismissal of the indictment is the only appropriate remedy. We need not decide whether dismissal would be required when the defense strategy has been disclosed to government agents but has not become public information.
 
 B. The Conflict of Interest
 
 68
 Even if we were to adopt the rule that, absent prejudice to the defendant, the disclosure of defense strategy would not violate the defendant's sixth amendment rights, we would reverse the decision in this case because of attorney Siegal's participation in the hearing on Verna's motion to dismiss and in the trial. Especially in the drug enforcement area, government informers are frequently criminals whom the government successfully "turns" through the blandishments of the plea bargaining process. We do not doubt the necessity of this practice, and our notice of it is not intended to be condemnatory. But since these informers, like Visceglia, are often actual defendants, they as well as the non-informer defendants are entitled to loyal legal representation. So long as we tolerate joint legal representation, the practice of resorting to turned criminals as informers will inevitably result in such joint representation and in its accompanying problems.
 
 
 69
 Those problems are dramatically illustrated by the instant case. Here Siegal's representation of both Visceglia and Verna not only created conflicting loyalties for the lawyer, but also put him in the impossible position of being a potential witness. As we mentioned earlier, the district court declined to explore the reasons why Verna acquiesced in Siegal's decision not to call Visceglia as a defense witness. But one possible reason for Siegal's reluctance to call Visceglia was the fact that Visceglia was Siegal's former client. That much the district court knew. Calling the significance of the Siegal-Visceglia relationship to Verna's attention would not have required any intrusion into the Siegal-Verna relationship. In his § 2255 motion Verna makes the claim, which is uncontradicted by this record, that at trial he was not aware of Siegal's continued representation of Visceglia between February 25, 1976, and March 12, 1976. Had Verna been alerted by the court to the problems of conflicting loyalties inherent in multiple representation, he might have pressed his earlier insistence that Siegal be removed from the case. In addition, the court might have made a record from which we could judge the extent and seriousness of any possible conflict of interest. One significant fact which might have surfaced was that the charge on which Siegal represented Visceglia on March 12, 1976, involved the same narcotics dealings which gave rise to the present conspiracy indictment and conviction. The state charges related to individual narcotics transactions rather than to a conspiracy. The record of the March 12 hearing discloses that Siegal argued to the Bronx Supreme Court that those charges should be dismissed because of the federal conspiracy charge. That contention was rejected. But the argument puts into focus a difficulty which Siegal might have had in representing both Verna and Visceglia. Due to his relationship with Visceglia, Siegal might have learned about other narcotics transactions which could have placed Visceglia in further jeopardy. If Siegal had indeed learned about other transactions, he could hardly have been expected to risk their disclosure by subjecting Visceglia to rigorous examination and cross-examination.
 
 
 70
 Moreover, the district court's reliance on a supposed pleading deficiency to dismiss Verna's § 2255 motion ignores both the content of that pleading and the critical point which it advances. That critical point is that Verna waived his right to present a witness in his behalf on the basis of advice from an attorney who owed an obligation to that witness, an obligation which may well have conflicted with the attorney's legal duty of undivided loyalty to Verna.
 
 
 71
 At the very least, before the district court permitted Siegal to choose between Visceglia and Verna and to represent the latter at the hearing on the motion to dismiss and at the trial, the court should have made an on-the-record disclosure of the potential conflicts to Verna. Nothing short of this will satisfy a reviewing court that there has been a knowing and intelligent waiver of the right to the effective assistance of an attorney who is singly devoted to the defendant. See Holloway v. Arkansas, --- U.S. ----, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); United States v. Dolan, 570 F.2d 1177 (3d Cir. 1978); United States ex rel. Hart v. Davenport, 478 F.2d 203, 209-11 (3d Cir. 1973). Here Siegal's continuing duty of loyalty to Visceglia was clear. No such on-the-record inquiry as that discussed above was ever made. Under these circumstances, even under a rule requiring a finding of prejudice, we would reverse the conviction and remand for a new hearing on the motion to dismiss and for a new trial, at which Verna could be represented by a different attorney. However, due to our previous holding the indictment must be dismissed.
 
 III. CONCLUSION
 
 72
 The judgment of conviction will be reversed and the case remanded to the district court for the entry of an order dismissing the indictment.
 
 
 
 *
 Honorable Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 Appellant's Appendix at 38
 
 
 [2]
 Fields testified:
 . . . I believe the only thing which (DEA agent Miller) did tell me was at one point, Mr. Visceglia had stated that the co-defendants felt that (sic) had nothing to be concerned about because the witnesses which we were going to have had been witnesses in a trial, a drug trial in New York, where the government had lost the case.
 App. at 241.